30 F.3d 132
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Kathy Ann WEST; Thomas J. West, Jr.; Thomas J. West, III,
an infant, by his mother and next friend Kathy Ann
West, Plaintiffs-Appellants,
v.
LIBERTY MUTUAL INSURANCE COMPANY, Defendant-Appellee.
 No. 93-2457.
 United States Court of Appeals, Fourth Circuit.
 Argued May 12, 1994.
Decided Aug. 3, 1994.
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling. Frederick P. Stamp, Jr., Chief District Judge. (CA-92-142-W).
 Argued: Michael W. McGuane, Haranzo & McGuane, Wheeling, WV, for appellants.
 Charles S. Cassis, Brown, Todd & Heyburn, Louisville, KY, for appellee.
 On Brief: Carl Ellsworth Paul, Jr., Goodwin, Dodd & Paul, Wheeling, WV; Thomas Schultz, Wheeling, WV, for appellants.
 W. Bruce Baird, Brown, Todd & Heyburn, Louisville, KY; James F. Companion, Schrader, Recht, Byrd, Byrum & Companion, Wheeling, WV, for appellee.
 N.D.W.Va.
 AFFIRMED.
 Before WILLIAMS, Circuit Judge, PHILLIPS, Senior Circuit Judge, and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 On December 14, 1989, a tractor-trailer truck driven by Charles Merritt Stevenson and owned by M.S. Carriers, Inc., collided with Kathy Ann West's vehicle. Kathy West's husband and infant son were in the car with her at the time of the accident. M.S. Carriers was insured by Liberty Mutual Insurance Company. The accident was reported to Liberty on January 9, 1990, by its insured, and Liberty undertook an investigation of the circumstances of the accident. On September 25, 1991, the Wests filed suit against the truck driver and M.S. Carriers, Inc., seeking to recover for damages sustained in the accident, primarily loss of consortium as a result of Kathy West's injuries. Liberty was not a named defendant in the complaint.
 
 
 2
 The Wests' alleged medical bills and lost wages through July 11, 1991, totalled $2,477. According to the Wests, Liberty made its first settlement offer on October 4, 1991, for $4,025. The next settlement offer of $30,000 was made on June 11, 1992, approximately 18 days before the scheduled trial. On June 26, 1992, the last business day before the scheduled trial, the Wests accepted Liberty's settlement offer of $112,120. The settlement and release agreement was executed on July 10, 1992, and an order was entered dismissing the Wests' claims against all parties, including Liberty, with prejudice.
 
 
 3
 The settlement and release agreement provided in paragraph one, titled "Release and Discharge":
 
 
 4
 In consideration of the payments set forth in Section 2, Plaintiffs hereby completely release and forever discharge Charles Merritt Stevenson, M.S. Carriers, Inc. and Liberty Mutual Insurance Company from any and all past, present or future claims, demands, obligations, actions, causes of action, wrongful death claims, rights, damages, costs, losses of service, expenses and compensation of any nature whatsoever, whether based on a tort, contract or other theory of recovery, which the Plaintiffs now have, or which may hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of, or which are the subject of the Complaint (and all related pleadings) including, without limitation, any and all known or unknown claims for bodily and personal injuries to Plaintiffs, or any future wrongful death claim of Plaintiffs' representatives or heirs, which have resulted or may result from the alleged acts or omissions of the Defendants.
 
 
 5
 ....
 
 
 6
 This release, on the part of the Plaintiffs, shall be a fully binding and complete settlement among the Plaintiffs, the Defendants and the Insurer, and their heirs, assigns and successors. The Plaintiffs agree to defend, indemnify and hold the Defendants and Insurer harmless from and against all such claims, demands, obligations, actions, causes of action, damages, costs and expenses.
 
 
 7
 The Plaintiffs acknowledge and agree that the release and discharge set forth above is a general release. Plaintiffs expressly waive and assume the risk of any and all claims for damages which exist as of this date, but of which Plaintiffs do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or otherwise, and which, if known, would materially affect Plaintiffs' decision to enter into this Settlement Agreement. The Plaintiffs further agree that Plaintiffs have accepted payment of the sums specified herein as a complete compromise of matters involving disputed issues of law and fact. Plaintiffs assume the risk that the facts or law may be other than Plaintiffs believe. It is understood and agreed to by the parties that this settlement is a compromise of a doubtful and disputed claim, and the payments are not to be construed as an admission of liability on the part of the Defendants, by whom liability is expressly denied.
 
 
 8
 (J.A. at 18-20) (emphasis added).
 
 
 9
 Five days later, on July 15, 1992, the Wests filed this suit against Liberty under Sec. 33-11-4(9) of West Virginia's unfair claims settlement practices statute, W.Va.Code Sec. 33-11-4(9) (1992), alleging wrongdoing in the processing of their claim.[1] Liberty moved for summary judgment on the grounds that the release agreement barred the Wests' action and that settlement of the underlying tort claim prevented the Wests from pursuing the bad faith settlement claim, because there was no determination of liability. The district court granted summary judgment to Liberty on both of these grounds. Because we agree with the district court that this claim is barred by the release provisions of the settlement agreement, we affirm on that ground and do not reach the question whether there must be a determination of liability prior to pursuit of a bad faith settlement claim.[2] " 'The law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy.' " Syllabus Point 1, Acord v. Chrysler Corp., 399 S.E.2d 860 (W. Va.1990) (quoting Syllabus Point 1, Riggle v. Allied Chem. Corp., 378 S.E.2d 282 (W. Va.1989)). The language of the agreement in this case is clear and unambiguous, and releases Liberty from liability for "any and all claims;" there is no allegation that the agreement was entered into because of fraud or duress, or that it is in contravention of law or public policy. The Wests were represented by counsel during the negotiation of the settlement and, by all accounts, the parties were aware of and consented to the language in the agreement. See Grant County Sav. & Loan Ass'n v. RTC, 968 F.2d 722, 724-25 (8th Cir.1992) (court of appeals will assume parties were fully aware of the terms and scope of their agreement when they have negotiated the release with the assistance of counsel and agreed to the language).
 
 
 10
 The Wests first argue that the release does not apply to Liberty because it was not a named party in the underlying lawsuit. We disagree. Whether Liberty was a defendant in the Wests' lawsuit is irrelevant when Liberty was unmistakably a party to the settlement agreement and "the Insurer" is repeatedly referenced in the agreement. Relying on language in the introductory recitals to the agreement, which refer to settlement of "all claims which are, or might have been the subject of the Complaint," (J.A. at 18), the Wests further contend that their bad faith settlement claim cannot be barred because it could not have been brought as a part of the underlying complaint. See Jenkins v. J.C. Penney Casualty Ins. Co., 280 S.E.2d 252, 259 (W. Va.1981) (private cause of action for bad faith settlement practices cannot be maintained until the underlying suit is resolved). Under West Virginia law, however, recitals to an agreement are "not ... parts of the contract, unless adopted as such by reference thereto." Martin v. Rothwell, 95 S.E. 189, 190 (W. Va.1917). There is no indication in the agreement that the parties intended the recitals to be part of the settlement and release, therefore the recital language relied on by the Wests is immaterial to the scope of the release. The language of the release controls and it indisputably bars this claim.
 
 
 11
 The Wests also argue that, under West Virginia law, " '[a] release ordinarily covers only such matters as may fairly be said to have been within the contemplation of the parties at the time of its execution,' " Murphy v. North Am. River Runners, Inc., 412 S.E.2d 504, 510-11, 512 (W. Va.1991) (quoting Syllabus Point 2, Conley v. Hill, 115 S.E. 883 (W. Va.1934), overruled on another point, Syllabus Point 4, Thornton v. Charleston Area Medical Ctr., 213 S.E.2d 102 (W. Va.1975), and that " '[e]xtrinsic evidence is admissible to show both the relation of the parties and the circumstances which surrounded the transaction,' " Murphy, 412 S.E.2d at 512 (quoting Syllabus Point 1, Cassella v. Weirton Constr. Co., 241 S.E.2d 924 (1978)). According to the Wests, there was no discussion during the settlement negotiations of settling any statutory bad faith claims against Liberty, and the Wests only intended to settle the claims in the underlying suit.[3] We find this argument unpersuasive. The Wests' conclusory allegation of their "true" intent is not sufficient to override the clear language of the release. See Bischoff v. Francesa, 56 S.E.2d 865, 870 (W. Va.1949) (" 'The polestar for the construction of a contract is the intention of the contracting parties as expressed by them in the words they have used.' ") (quoting Ames v. American Nat'l Bank, 176 S.E. 204, 216 (Va.1934)) (emphasis in original); accord Gurney Indus., Inc. v. St. Paul Fire & Marine Ins. Co., 467 F.2d 588, 592 (4th Cir.1972) (subjective, unexpressed intent of one party to contract was immaterial in interpreting language of contract under North Carolina law); Bernstein v. Kapneck, 430 A.2d 602, 606 (Md.1981) ("[B]ecause releases are contracts, conventional rules of construction dictate that when the scope of the agreement is stated in clear and unambiguous language, the words utilized to express this breadth should be given their ordinary meaning...."); Board of Trustees v. Sherman, 373 A.2d 626, 629 (Md.1977) (Under Maryland law, "the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean; where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed....").
 
 
 12
 Here, the Wests have failed to allege any circumstances surrounding the execution of the release demonstrating anything other than an unqualified intent to enter into a general release of all claims against Liberty Mutual. See Virginia Impression Prod. Co. v. SCM Corp., 448 F.2d 262, 265 (4th Cir.1971) ("[T]he very nature of a general release is that parties desire to settle all matters forever."), cert. denied, 405 U.S. 936 (1972); Overberg v. Lusby, 727 F.Supp. 1091, 1093 (E.D. Ky.) (parties intending to leave certain claims out of a general release should make their intent to do so manifest), aff'd, 921 F.2d 90 (6th Cir.1990). Accordingly, the Wests are bound by the release, and enforcement of this release bars their unfair settlement practices claim against Liberty.
 
 
 13
 For the foregoing reasons, the judgment of the district court in favor of Liberty Mutual is affirmed.
 
 
 14
 AFFIRMED.
 
 
 
 [1]
 Liberty removed the suit from the Circuit Court of Marshall County, West Virginia, based on diversity of citizenship. The settlement agreement provides in paragraph 12 that it "shall be construed and interpreted in accordance with the laws of the State of West Virginia." (J.A. at 24.)
 
 
 [2]
 We note that certification has been accepted by the West Virginia Supreme Court of Appeals in the case Poling v. Motorists Mut. Ins. Co., certification accepted, No. 22135 (W. Va. February 16, 1994), regarding virtually the same legal question. The question as certified by the district court is:
 Whether the settlement of the underlying tort case against William Martin Bonar precludes a separate and independent recovery against Motorists arising out of Motorists' alleged bad faith insurance practices when the third party plaintiff made a voluntary settlement of a disputed personal injury claim and settles the property damage claim for the sum demanded which includes a sum for inconvenience?
 
 
 [3]
 Because the Wests filed this suit within five days of the execution of the settlement agreement, it is difficult to conclude that they did not contemplate this bad faith claim